UNITED STATES DISTRICT COURT
DISTRICT OF NORTHERN CALIFORNIA

DANIEL REALE,

    Plaintiff

v.

    Case No.: 3:21-CV-01412-AWT

ALPHABET, INC. and
GOOGLE LLC and
YOUTUBE LLC

    Defendants

MARCH 11, 2022

**MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS (ECF 40)**

**I. Introduction**

This is the Defendants' second bite of the apple.

They have again attempted a specious citation to extraneous matters that are not controlling, do not have relevance and do not at all accomplish anything but to waste the Court's time.[1]

This matter, contrary to the representations of the Defendants, involves unlawful trade practices and pure, unmitigated restraint and obstruction of purely commercial activities. Whether there are peripheral effects on public discourse and freedom of speech is relevant only to the extent these profound effects are aggrivating circumstances warranting additional damages at trial.

---

1 Citing to *Reale v Haskell*, *Reale v Home Depot*, *Reale v Match Holdings, II*. None of these cases even involve the same legal theories, let alone same fact patterns. The Defendants are casting aspersions and playing politics out of the gate, again.

This matter has involves the scheme of building a functional monopoly with unprecedented control over information and public discourse was years in the making. The Defendants branded their enterprise in the early and mid 2000s as an escape from limited content availability, especially mainstream media. Instead, the Monopoly of the Defendants partnered with it. It decided, in the ways alleged in the Amended Complaint to shut out competition. It started that process by locking up the mobile device market such that only the Monopoly's applications were installed on brand new phones the second they left the factory. It then gave certain content provides such as mainstream media and governments free product – ad promotions and efforts to suppress content of the Plaintiff's channel – that they never paid for, they never asked for and Google Ads does not even sell and never could legally sell.

The Monopoly is in the business of parlaying the very tangible assets of advertising, user data, ad revenues, content promotion, and in the case at bar, the suppression of content promotion and ad revenues.

The Defendants' second bite at the apple offers nothing new in terms of analysis. The only function and result is to delay the Rule 26f conference and commencement of discovery.

## II. Standard of Review

A defendant may move to dismiss a claim for relief pursuant to Rule 12(b)(6) if the claim "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 8 requires that pleadings include "a short and plain statement of the claim showing that the pleader is entitled to relief." Id. 8(a)(2).

A motion to dismiss brought pursuant to Rule 12(b)(6) tests the legal sufficiency of a claim. Dismissal is proper if there is a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011), cert. denied, 132 S.Ct. 1762 (2012). In resolving a 12(b)(6) motion, a court's review is generally limited to the operative pleading. *Daniels-Hall v. National Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010); *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007); *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 1003-04 (9th Cir. 2006); *Schneider v. California Dept. of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (citing *Bell Atlantic Corp. v. Twombly*); Conservation Force, 646 F.3d at 1242; *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009). The Court must accept well-pled factual allegations as true and draw all reasonable inferences in favor of the non-moving party. *Daniels-Hall*, 629 F.3d at 998; Sanders, 504 F.3d at 910; Huynh, 465 F.3d at 996-97; *Morales v. City of Los Angeles*, 214 F.3d 1151, 1153 (9th Cir. 2000). Pro se litigants are entitled to have their pleadings liberally construed and to have any doubt resolved in their favor, *Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012); *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012); *Silva v. Di Vittorio*, 658 F.3d 1090, 1101 (9th Cir. 2011); *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010).

Further, "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216-17. "Plaintiff's

complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is implausible. The standard at this stage of the litigation is not that plaintiff's explanation must be true or even probable. The factual allegations of the complaint need only 'plausibly suggest an entitlement to relief.'" Id., quoting *Iqbal*, 556 U.S. at 678 (emphasis in original). "Rule 8(a) 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' to support the allegations." Id., quoting *Twombly*, 550 U.S. at 556 (emphasis added in Starr).

**III. Relevant Facts the Court Must Take as True and Well Pleaded, and Which Satisfy All the Elements**

A. <u>Count One and Two, Under 15 USC §15 for Violations of 15 USC §§1 and 2</u>

Counts One and Two allege violations of 15 USC §§1 and 2. The purpose, spirit and intent is to protect content producers like those mentioned in ¶11 of the Amended Complaint, and do it in a manner that overtly harms and forecloses competition.

*1. Violations of §1 of the Sherman Act*

It became clear upon further investigation that there were at least three entities involved – Alphabet, Inc. (the parent company) and its subsidiaries Google LLC and Youtube LLC. They are in fact all seperate. Alphabet's purpose is generating the scale of the operation (see Id, ¶2-4). It also owns other companies not directly involved in the Monopoly, and is the 5th most valuable company by market cap in the world (Id, ¶7, 8). Google's function in the Monopoly is to go out and buy tech companies (Id, ¶9-11), secure revenue sharing agreements to exclude choices for mobile users such that it could deep capture the audience for mobile video content (¶15), and then steer all the traffic to

Youtube (¶19). The entire Monopoly, via Youtube, brands itself content neutral to entice users already captured through cell phones by way of revenue sharing agreements with device manufacturers and through having locked up the search engine market. (¶21) The entire video content industry was monopolized through outright purchase (¶22), and in combination with getting all major cell phone manufacturers to preinstall the Monopoly's video applications in addition to having locked up the search market (and having made Youtube the world's second largest search engine, only behind Google see ¶54), it is no mystery how Youtube obtained 163 million monthly active users and over two billion total users. The Monopoly offers and deals in very tangible products – ad revenue and content promotion – which it tangibly values in excess of $15 billion per year (Id ¶8).

The Monopoly built the world's largest video content production market in human history by selling the public that it was an open equal opportunity platform (Id ¶14), yet it protects an annointed, preferred class of content producers from competition from average users such as the Plaintiff, preventing them from obtaining ad revenue (¶11, 12). It even does that to a degree that destroys its own potential profit margins (¶¶12, 23, 24, 35, 37) solely for the purposes of punishing dissenting content (¶¶48, 59, 63).

A violation of 15 USC §1 requires a showing that the alleged conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). Indeed, the Amended Complaint and Count One describe that, how the entities involved did it and how they ultimately created a monolithic user and content base that one could only compete with by developing one's own: (a) search search engine; (b) preferred relationships with

mainstream media channels; and (c) revenue sharing agreements with mobile device manufacturers to install one's apps to the exclusion of all others who would compete. What clearly establishes the injury and aggravating circumstances is the general scheme of the Defendants to punish and suppress content views and ad revenue that conflicts with the type of preferred content users specified in ¶11. In this case, it did real, permanent and life altering damage as a matter of the Monopoly's policies to the very scientific discourse necessary to save lives.

The allegations in and pertaining to Count One clearly establish the Per Se Rule. Restraints analyzed under the Per Se Rule are those that are always (or almost always) so inherently anticompetitive and damaging to the market that they warrant condemnation without further inquiry into their effects on the market or the existence of an objective competitive justification. *(U.S. v Socony-Vacuum Oil Co., 310 U.S 150 (1940); United States v. Sealy, Inc., 388 U.S. 350 (1967); United States v. Topco Associates, Inc., 405 U.S. 596 (1972); Craftsmen Limousine, Inc. v. Ford Motor Co., 363 F.3d 761 (8th Cir. 2004)*

None of the conduct complained of even satisfied the Rule of Reason. This test focuses on the state of competition within a well-defined relevant agreement. It requires a full-blown analysis of (i) definition of the relevant product and geographic market, (ii) market power of the defendant(s) in the relevant market, (iii) and the existence of anticompetitive effects. The court will then shift the burden to the defendant(s) to show an objective procompetitive justification. This analysis distinguishes between restraints with an anticompetitive effect (or resulting in conduct likely to cause such injury) that are

harmful to the consumer, and restraints stimulating competition that are in the consumer's best interest. (*Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49 (1977); *State Oil v. Kahn,* 522 U.S. 3, 10 (1997)).

The conduct complained of in shutting down discussion about what easily amounts to the greatest public health failure in 100 years can easily be established as anticompetitive by the Quick Look Test elucidated in *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986). "test of legality is whether the restraint imposed is such as merely regulates, and perhaps thereby promotes, competition, or whether it is such as may suppress or even destroy competition." Id, at 458, quoting *Chicago Board of Trade v. United States,* 246 U.S. at 246 U. S. 238. The Amended Complaint is pretty clear that the policy of the Defendants is to call anything that disagrees with interpretations of CDC data, possible COVID-19 treatments or public health harms inflicted as a consequence of COVID-19 mitigation measures as "medical misinformation" or "deceptive products", and thus remove the content and strangle even the potential for ad revenue.

### 2. Violations of §2 of the Sherman Act

All of these things being established in the legally sufficient pleading further set up Count Two, arising by way of a violation of §2 of the Sherman Act. Preliminarily, the arrangement of the Monopoly sets up what is supposed to be a cooperative venture – you create the content, you get an equal opportunity to get and obtain traffic and ad revenue. This is precisely the arrangement contemplated in *Aspen Skiing v. Aspen Highlands Skiing,* 472 U.S. 585 (1985) The jury instructions inform this discussion: ""In other words, if there were legitimate business reasons for the refusal, then the defendant, even if he is

found to possess monopoly power in a relevant market, has not violated the law. We are concerned with conduct which unnecessarily excludes or handicaps competitors. This is conduct which does not benefit consumers by making a better product or service available -- or in other ways -- and instead has the effect of impairing competition." Id at 597. The Parties, the pleadings and the now Amended Complaint agree – the Defendants are immune from suit for things *other* people post on Youtube. The Defendants are not publishers – indeed, the Amended Complaint is very clear that they are not publishers. They are content advertisers, sellers and promoters – in addition to sellers of user data and analytics. It makes no business sense for the Defendants to suppress either sanity or good news in order to promote the hysterics of ensconced content producers like those named in ¶11 who get special deals, special rates, special services and unwritten policies to silence the ad revenue and view counts of the Plaintiff and those similarly situated. By way of example, it made no business sense (even according to the Defendants' own well adoped model of scaling up content), to delete 15 years' worth of content and the world's largest internet philosophy podcast from their platforms in furtherance of the same policy (see ¶26). The practice is in fact of such a magnitude that shareholders should be outraged. To be clear – the Defendants are purposefully harming their own revenue streams to promote a special class of users.

In sum, the *Aspen Skiing* factors satisfied are as follows: (1) there must be a preexisting relationship where the monopolist and the injured party refused to deal but has initially existed (which the channel still exists and involves a takedown of some videos); (2) the refusal to deal must invoolve products which are already out there for consumption (in

which case it is the content left up), (3) the conduct must suggest a design to forego profits to reinforce monopolistic ends (which it does). All of these factors have been met, in addition to the harms wilfully inflicted by the Defendants to promote the ends of preferred content producers.

B. <u>Count Three, Under 15 USC §15 for Violations of 15 USC §13(a), (d),(e) and 13a</u>

Those first few steps are substantial enough to plead a §1 and §2 claim. However, the Defendants took it a step further by giving the content providers named in ¶11 as well as government entities different services that are not available and ad promotion that did not buy (see ¶12-14). Specifically, those services involve free content promotion in addition to free content suppression of the Plaintiff's and other similar channel's content. This is exactly the situation contemplated in *Toys "R" US vs FTC* 221 F.3d 928 (7th Cir. 1999). There, the company's boycott succeeded in causing ten major toy manufacturers to reduce output of toys to warehouse clubs, which protected the company from having to lower its prices. Here, the Defendant's efforts shut down content that would generate profit to suppress content competing with the Plaintiff's content to benefit ensconsed channels and preferred cloud storage purchasers. The aim and goal is to fix prices by offering free and reduced price services to one type of content provider while purposefully injuring another. Agreements between competitors to fix prices for services or products are always or almost always per se illegal. The Supreme Court has called horizontal price-fixing an "archetypal example" of an unlawful restraint. *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980).

The Defendants position that this is frivolous is in fact frivolous itself. However, this

is likely an issue of first impression, and contrary to the Defendants' position, it is because ad revenue and channel promotion are assets themselves they view as tangible.

### D. Count Four, Connecticut Unfair Trade Practices Act

*1. The Elements Have Been Met*

The Fourth Count sounds in the Connecticut Unfair Trade Practices Act, which incorporates the public policy violations set forth in Counts One through Three (¶70). ¶68 is clear that, "The Defendants reach into the State of Connecticut to solicit users in Connecticut to create and upload their content to Youtube under the pretense that their content and work will not only be treated equally – but also lead to ad revenue as subscribers and views accumulate." They then falsely entice the Plantiff and others to create an account under the pretense of having a fair chance at ad revenue and that all content is treated equal, which it is not - and the motive of the Monopoly is to protect specific ensconsed content producers from competition (Id ¶69). The ascertainable loss at issue is the time spent creating content and preclusion from ad revenue along with overt efforts to preclude them from the market on equal footing (¶¶68, 70). The Defendants do this knowing they are not publishers, have no liability for content posted and that they purposefully harm their own bottom line by protecting preferred content producers (¶73).

By way of reference to the earlier components of the Amended Complaint, the Defendants purposefully harmed both scientific dialogue and their own profit margins to protect those preferred content producers.

"[General Statutes §] 42-110b (a) provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any

trade or commerce. It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . . In order to enforce this prohibition, CUTPA provides a private cause of action to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice . . . ." (Internal quotation marks omitted.) *Harris v. Bradley Memorial Hospital & Health Center, Inc.*, 296 Conn. 315, 350–51, 994 A.2d 153 (2010).

The Defendants further plead that the damages or the loss at stake is "intangible". It only need be ascertainable – and it is.

"The ascertainable loss requirement [of § 42-110g] is a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief. . . . Thus, to be entitled to any relief under CUTPA, a plaintiff must first

prove that he has suffered an ascertainable loss due to a CUTPA violation." (Internal quotation marks omitted.) *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, supra, 287 Conn. 217–18. CUTPA, however, "is not limited to providing redress only for consumers who can put a precise dollars and cents figure on their loss"; *Hinchliffe v. American Motors Corp.*, 184 Conn. 607, 618, 440 A.2d 810 (1981); as the ascertainable loss provision "do[es] not require a plaintiff to prove a specific amount of actual damages in order to make out a prima facie case." Id., 612–13. Rather, as we explained in Hinchliffe, "[d]amage . . . is only a species of loss"; (internal quotation marks omitted) id., 613; hence "[t]he term 'loss' necessarily encompasses a broader meaning than the term 'damage.'" Id. Accordingly, this court previously has concluded that, for purposes of § 42-110g, an ascertainable loss "is a deprivation, detriment [or] injury that is capable of being discovered, observed or established. . . . [A] loss is ascertainable if it is measureable even though the precise amount of the loss is not known. . . . Under CUTPA, there is no need to allege or prove the amount of the actual loss." (Citation omitted; emphasis added; internal quotation marks omitted.) *Service Road Corp. v. Quinn*, 241 Conn. 630, 638–39, 698 A.2d 258 (1997).

### IV. The First Amendment Does Not Bar Recovery by the Plaintiff

The Defendants make the novel (although misled) claim that the First Amendment bars the CUTPA claim (which is predicated upon the Sherman Act and Robinson Patman claims). The Supreme Court decided that question in *Associated Press et al v United States* 326 U.S. 1 (1945). There, "The United States filed a bill in a Federal District Court for an injunction against AP and other defendants charging that they had violated the Sherman Anti-Trust Act, 26 Stat. 209, in that their acts and conduct constituted (1) a

combination and conspiracy in restraint of trade and commerce in news among the states, and (2) an attempt to monopolize a part of that trade. " Id, at 3. The case, eerily similar to what the Defendants are doing here, is that "The heart of the government's charge was that appellants had by concerted action set up a system of By-Laws which prohibited all AP members from selling news to non-members, and which granted each member powers to block its non-member competitors from membership. These By-Laws, to which all AP members had assented, were, in the context of the admitted facts, charged to be in violation of the Sherman Act." This is analogous to the situation contemplated in the Amended Complaint where:

> "The *modus operandi* of the Monopoly before and since has been to purchase content, and by extension, purchase the traffic, and by further extension, monopolize the content that can (favored content channels) and cannot (channels like the Plaintiff's[1]) be exposed to the traffic. The Enteprise has since developed collateral relationships with ABC, NBC, Fox Now, Reuters, New York Times, Los Angeles Times and CBS (among others) toward the not only do these news outlets partner to share videos through YouTube TV, Google TV and the Monopoly's other platforms – these outlets also have Youtube Channels of their own that generate shared revenue. Their content is offered the opportunity to benefit from revenue streams in violation of 15 USC §§1 and 2 *vis-a-vis* the Plaintiff by operation of the exclusion of his content while offering preferred channels (such as those named in this ¶ as well as the CDC) preferred content placing and advertising that the Plaintiff does not have available to purchase to promoted his channel and that are not available to normal channels. The Monopoly accomplishes this goal in regard to censoring COVID-19 content that would generate revenue for users such as the Plaintiff under the guise and color of its "Community Guildelines", which it selectively enforces. By way of example, had the ABC, NBC, Fox Now, Reuters, New York Times, Los Angeles Times or CBS posted the content that the the Plaintiff had on his channel as complained of, *infra*, the content would have been allowed to remain and the views increase. " Id, ¶11

It would appear the *Associated Press* defendants made precisely the same myopic claims that the Defendants here have – that no tangible commodity was at issue. There,

the Supreme Court was clear, "defendants are charged with violating the same statutes. Member publishers of AP are engaged in business for profit exactly as are other business men who sell food, steel, aluminum, or anything else people need or want." *supra*, at 7.

The claims and authorities cited by the Defendants are unpersuasive and entirely off point.

*Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) challenged the constitutionality of a statute requiring public officials to be entitled to reply to editorial comment, not a Sherman Act, Robinson Patman or any trade practice claim. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994) involved the Cable Television Consumer Protection and Competition Act of 1992 - not a Sherman Act, Robinson Patman or any trade practice claim. *Hurley v. Irish-Am. Gay*, 515 U.S. 557, 573-74 (1995) involved a state law prohibiting discrimination on account of sexual orientation in places of public accommodation - not a Sherman Act, Robinson Patman or any trade practice claim. *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629-30 (D. Del. 2007) also does not involve a Sherman Act claim, nor does it come close to approximating the relationship or claims among the Parties in the Instant Matter – it involved one ad to be run one time to promote two websites and no prior existing relationship of any kind nor of any monopolistic protected class as the Instant Matter contemplates in ¶11 and elsewhere.

*Zhang v. Baidu.com, Inc.*, 10 F. Supp. 3d 433, 440-41 (S.D.N.Y. 2014) (citation omitted) involves and comments on "...editorial judgments of private speakers on issues of public concern..." The Defendants did not make an editorial judgment. They made a monopoliziation and price fixing judgment to harm their own bottom line to protect a class

as the Instant Matter contemplates in ¶11 and elsewhere. *Zhang* does not at all involve trying to economically defeat a relationship it enticed the Plaintiff into. Moreover, that case contemplates "...the algorithms themselves were written by human beings, and they "...inherently incorporate the search engine company engineers' judgments about what material users are most likely to find responsive to their queries..." Id, 438-439, which is inapposite to the instant matter where the Defendants are actively conspiring to ensure what users will not find or at all be likely to find in a manner that harms their profit margins to protect a specific class of content sold in the commercial context.

In sum, the Defendants' First Amendment claims are disingenuous. They are selling content. They are, in the process of selling that content, acquiring user data, preferences and behaviors to develop and inform their own analytics – for profit. They are further purposefully harming that profit to protect an ensconsced class of content and content producers.

### V. Section 230 Does Not Apply

The Defendants finally attempt to use 47 USC §230 as a blanket 'get out of jail free card'. Again, their authorities are not on point. They say, "*Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997)" There, the Fourth Circuit Court of Appeals reasoned that Section 230 of the federal Communications Decency Act of 1996 provides broad immunity to Internet service providers (ISPs) from online libel suits. This is not a libel suit. This does not involve offensive content placed on the platform that the Plaintiff wishes to take issue with. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 258 (4th Cir. 2009) is equally unavailing. All it did was held that an online content hosting service has

immunity from suits relating to content created by its third party authors. The site is analogous to the Better Business Bureau or Ripoffreport.com hosting content giving business feedback. *Bennett v. Google, LLC*, 882 F.3d 1163, 1167 (D.C. Cir. 2018) involved a negative review of sports apparel. *Baldino's Lock & Key Serv., Inc. v. Google, Inc.*, 88 F. Supp. 3d 543, 547 (E.D. Va.) was brought by a locksmith who took issue with Google listing who he deemed to be numerous unlicensed locksmiths.

*Gonzalez v. Google, Inc.*, 282 F. Supp. 3d 1150, 1163 (N.D. Cal. 2017) again involved things a third party took issue with caused by others - "This case arises from the tragic death of Nohemi Gonzalez, who was murdered during the November 2015 attacks in Paris committed by terrorists associated with the Islamic State of Iraq and Syria ("ISIS"). Plaintiffs are Gonzalez's surviving family members, including her mother, father, stepfather, and brothers. They seek to hold Defendant Google, Inc. ("Google") liable for her death under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, based on Google's ownership and operation of YouTube."

*Klayman v. Zuckerberg*, 753 F.3d 1354, 1359 (D.C. Cir. 2014) is equally unavailing to Sherman Act and Robinson Patman claims. "Three years ago, plaintiff-appellant Larry Klayman encountered a page on Facebook's social networking website entitled "Third Palestinian Intifada," which called for Muslims to rise up and kill the Jewish people. Facebook subsequently removed the Third Intifada page from its website, but not promptly enough for Klayman. He filed suit against Facebook and its founder, Mark Zuckerberg, alleging that their delay in removing that page and similar pages constituted intentional assault and negligence." Id, 1355

Finally, *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 409-10 (6th Cir. 2014) was equally off point and entirely irrelevant. "This case presents the issue of whether the Communications Decency Act of 1996 (CDA), 47 U.S.C. § 230, bars the state-law defamation claims of plaintiff-appellee Sarah Jones. Jones was the unwelcome subject of several posts anonymously uploaded to www. The Dirty. com, a popular website operated by defendants-appellants Nik Lamas–Richie and DIRTY WORLD, LLC ("Dirty World"), and of remarks Richie posted on the site." at 401

*Not a single authority cited involves the commercial nature of the activity complained of as alleged.* Indeed, the only authority on point remains that presented here, *Associated Press et al v United States* 326 U.S. 1 (1945). The difference is clear: government cannot compel speech or association. What it can do, and what it has done through CUTPA, the Sherman Act and Robinson Patman is to ban conspiracies to restrain trade and commerce or otherwise fix prices – a cornerstone of economic liberty in American jurisprudence.

### VI. Conclusion

It is clear that an antitrust plaintiff *"should be given the full benefit of [its] proofs without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each" Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962).

The fatal defect of the Defendants' argument is that that they have zero liability for anything this Plaintiff posts, period, even if it were truly false and there was zero good faith reason to believe it. What the Defendants have done is to censor the CDC's own data

taken as true and well pleaded. The Defendants ask this Court to grant commercial content sale First Amendment protections the Sherman Act never intended and the Supreme Court correctly agreed that could never apply.

The Defendants then ask this Court to view this case in a political context even though their own actions as pleaded harm their own profits in addition to harming the very necessary public health and scientific discourse required to expeditiously, scientifically, fairly and honestly navigate our way out of the COVID-19 pandemic with the fewest loss of lives possible. The Defendants obstructed the scientific process necessary to do that.

Sadly, the Defendants have adopted the Settled Public Religion that excludes any data that would suggest or tend to suggest there could possibly be treatments for COVID or that the same could ever exist. The conduct of the Defendants from the onset suggests a later approach that will attempt to defy the Daubert Standard itself.[2]

The motion to dismiss should be denied.

THE PLAINTIFF,
DANIEL REALE

/s/ Dan Reale
Daniel Reale
20 Dougherty Ave
Plainfield, CT 06374
(860) 377-8047
headlinecopy@gmail.com

---

2 See *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993). This Plaintiff eagerly looks forward to some actual good faith attempt by the Defendants at science or scientific evidence other than worn phrases like "settled science", or "medical misinformation" such that its experts may be fact checked under oath at a deposition. Just because the results of the projected models did not pan out and the data agrees doesn't mean we can censor and restrain commerce itself to suppress what truths the data tell us.

# CERTIFICATE OF SERVICE

I, Daniel Reale, hereby certify that a copy of the foregoing was transmitted to Counsel for the Defendants on March 11, 2022 via PACER ECMF as follows:

/s/ Dan Reale
Dan Reale


Jonathan M. Jacobson
Wilson Sonsini Goodrich & Rosati
1301 Avenue of the America
4oth Floor
New York, NY 10019
212-497-7758
Fax: 212-999-5899
Email: jjacobson@wsgr.com

Justina Kahn Sessions
Wilson Sonsini Goodrich & Rosati, P.C.
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105
415-947-2000
Fax: 415-947-2099
Email: isessions@wsgr.com

Rachael Racine
1301 Avenue of the Americas 4oth Floor
New York, NY 10019
212-497-7766
Email: rracine@wsgr.com